IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

CONMED CORPORATION,

               Plaintiff,               Civil Action No.
                                         6:13-CV-1226 (GTS/DEP)

     v.

IOAN COSMESCU and I.C. MEDICAL,
INC.,

               Defendant.

───────────────────────────────

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

BOND, SCHOENECK & KING PLLC    DAVID L. NOCILLY, ESQ.
One Lincoln Center
Syracuse, NY 13202-1355

CONMED CORPORATION          DANIEL S. JONAS, ESQ.
525 French Road
Utica, NY 13502

FOR DEFENDANTS:

UNDERHILL LAW OFFICE PLLC     ALBERT L. UNDERHILL, ESQ.
7907 North 16th Drive
Phoenix, AZ 85021

PURCELL LAW OFFICE            ROBERT E. PURCELL, ESQ.
211 West Jefferson Street
Suite 24
Syracuse, NY 13202

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This is an action between two direct competitors engaged in the manufacture and marketing of medical products. At issue in the case are two patents held by defendants Ioan Cosmescu and I.C. Medical, Inc. (collectively "I.C. Medical"), that relate to a handheld electrosurgery pencil designed for use with an electrosurgery unit ("ESU") to cut tissue and coagulate blood vessels. In response to threats by I.C. Medical that it would be sued for patent infringement, based upon its marketing of a device accused of infringing the patents at issue, plaintiff ConMed Corporation ("ConMed") preemptively commenced this action seeking a declaratory judgment that I.C. Medical's patents are neither valid nor infringed by ConMed. I.C. Medical, in turn, has answered and counterclaimed interposing two claims of patent infringement against ConMed.

Despite their best efforts, the parties have been unable to reach agreement regarding the proper construction of four terms included within the patent claims asserted by I.C. Medical in the action. The question of claim construction has been referred to me for the issuance of a report and recommendation. Based upon the parties' written submissions and a

2

claim construction hearing, the following sets forth my recommendations concerning the contested terms.

I.    <u>BACKGROUND</u>

At the heart of this action are two patents. The first is United States Patent No. 7,935,109 ("'109 Patent"), entitled "Multifunctional Telescopic Monopolar/Bipolar Surgical Device and Method Thereof" and issued on May 3, 2011. Dkt. No. 4 at 8-22. The second patent at issue is United States Patent No. 8,414,576 ("'576 Patent"), entitled "Swivel Device For Electrosurgery Pencil and Surgical Smoke Evacuation" and issued on April 9, 2013. *Id.* at 24-32. Both the '109 and '576 Patents were issued to defendant Ioan Cosmescu, the inventor, and, according to defendants, are now owned by defendant I.C. Medical, Inc. Dkt. No. 4 at 2-3, 8, 24; *see also* Dkt. No. 46 at 5-6.[1]

The two patents in suit are directed toward a handheld electrosurgery pencil capable of performing various surgical tasks, including cutting and cauterization, the latter of which is accomplished through a radio frequency electric current applied to an electrode placed at

---

[1]      In its amended complaint, ConMed alleges that the patents in suit are actually owned by both defendants Ioan Cosmescu and I.C. Medical, Inc., and that defendant Ioan Cosmescu is the founder and president of defendant I.C. Medical, Inc., which is the exclusive licensee under the two patents. Dkt. No. 4 at 2-3. I.C. Medical denies these allegations. Dkt. No. 46 at 2.

the surgical site. '109 Patent, Abstract. An embodiment of the surgical device disclosed in the '109 Patent is depicted in the following drawing:



FIG.3a

'109 Patent, FIG. 3a.

The device shown above includes a main body **42**, a telescopic body **44** contained within the main body **42** in such a manner that allows it to be extended outward from and retracted into the main body **42**, a locking element **46** to lock the telescopic body **44** to the main body **42** at a predetermined length, a bipolar electrode **48** contained within the telescopic body and main body such that it is capable of being in electrical contact with the ESU, and a connector element **50** for connecting the main body **42** of the device **40** to a smoke evacuator tubing, which is not shown in the drawing. '109 Patent, 7:23-37. Located on the main body **42** are a series of selection buttons for such available functions such as cutting **52**, coagulation **54**, and argon beam coagulation **56**.[2] *Id.* at 7:37-40.

---

[2]    According to the '109 Patent specification, the selection button for argon beam coagulation is optional, and the device provided for in the invention can be equipped with solely cutting and coagulation capabilities. '109 Patent, 7:40-43.

A prominent feature of the '576 Patent is an exhaust port designed to evacuate smoke and other debris from the site of the surgical procedure. '576 Patent, Abstract; '576 Patent, 2:29-34; '109 Patent, 3:34-38. The inclusion of this feature is shown in the following two drawings:



FIG.3



FIG.4

'576 Patent, FIGS. 3, 4.

Figure 3 discloses a side view of an electrosurgery pencil **402** with an electrical cord **28** routed through a swivel device **10** so that the cord **28** does not twist the pencil in the hand of the surgeon during an electrosurgery procedure. '576 Patent, 4:6-12. Figure 3 also demonstrates a telescopic electrosurgery pencil that may accommodate smoke evacuation through its interior. *Id.* at 4:13-15. In Figure 4, the pencil **402** is equipped with a smoke evacuation shroud attachment **410** connected to a

swivel device **10**. *Id.* at 19-21. A collar **26** of a rotating member **18** fits over the vacuum tube **30** to create an airtight connection between the vacuum tube **30** and rotating member **18**. *Id.* at 21-24. As in Figure 3, the connection between the swivel device **10** and smoke evacuation shroud attachment **410** reduces drag at the distal end of the smoke evacuation shroud attachment **410** while the surgeon performs a procedure. *Id.* at 27-32.

Defendants allege that by manufacturing, offering to sell, and selling electrosurgical pencils marketed under the tradename GoldVac®, ConMed has infringed three claims contained in the two patents in suit. Dkt. No. 46 at 5.

II.     PROCEDURAL HISTORY

After being notified in writing of I.C. Medical's contention that plaintiff's accused products infringe certain claims of the '109 and '576 Patents, ConMed commenced this action on October 2, 2013, requesting the entry of a declaratory judgment of non-infringement and patent invalidity. Dkt. No. 1. ConMed subsequently filed a first amended complaint, the currently operative pleading, on October 23, 2013. Dkt. No. 4. Following the denial of I.C. Medical's motion to dismiss, Dkt. No. 39, I.C. Medical submitted an answer on March 30, 2015, generally denying the

allegations contained in ConMed's amended complaint and seeking findings of patent validity and infringement. Dkt. No. 46. ConMed filed its an answer to I.C. Medical's counterclaims on April 8, 2015. Dkt. No. 52.

In accordance with the court's local patent rules, the parties have conferred and submitted a joint claim construction statement revealing their disagreement concerning four claim terms contained within the two patents in suit. Dkt. No. 65. The question of claim construction has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. No. 80. In accordance with that referral, a claim construction hearing was conducted on March 2, 2016. Text Minute Entry Dated Mar. 2, 2016. At the conclusion of that hearing, I reserved decision and advised the parties that I would provide a written report and recommendation to Chief District Judge Glenn T. Suddaby concerning the issue of claim construction. *Id.*

III.     DISCUSSION

    A.     Claim Construction: The Legal Framework

Patent claim construction presents an issue of law, to be decided by the court. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*); *see also Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d

1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases."). "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." *Lighting Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014) (*en banc*).

As a general rule, a court tasked with construing a patent must assign claim terms their ordinary and customary meanings as understood by a person of ordinary skill in the art when read in the context of the patent specification and prosecution history.[3] *Butamax(TM) Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1308-09 (Fed. Cir. 2014); *Thorner v. SONY Computer Entm't Am., LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313; *accord, Thorner,* 669 F.3d 1365; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a

---

[3]     None of the parties have provided the court with a definition of "a person of ordinary skill in the art" in the context of this litigation.

'heavy presumption' that a claim term carries its ordinary and customary meaning.").

There are two exceptions to this general rule. The first involves a circumstance in which a patentee has acted as its own lexicographer, setting out a definition of a term that differs from its ordinary and customary meaning. *Butamax(TM)*, 746 F.3d at 1309; *Thorner*, 669 F.3d at 1365. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365 (quoting *CCS Fitness, Inc.*, 288 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. Under the second exception, a claim term may also properly be given a meaning that differs from its customary meaning "'when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Butamax(TM)*, 746 F.3d at 1309 (quoting *Thorner*, 669 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. These two exceptions to the rule that patent terms should be given their ordinary meaning are both narrow and exacting. *Thorner*, 669 F.3d at 1366-67.

While the words of a patent claim will generally control, they should not be interpreted in isolation; "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular

claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In this respect, a patent specification, which some liken to an internal dictionary, must be carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* When resorting to a patent's specification for guidance with respect to disputed claim terms, a court must consider it as a whole, and where possible, all portions should be read in a manner that renders the patent internally consistent. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Although the language of a patent specification can provide important clues regarding the proper construction to be accorded to a claim term, there are limitations upon its usefulness. "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular embodiments in the specification be read into the claims; the general rule

is that the claims of a patent are not limited to the preferred embodiment."

*Cornell Univ. v. Hewlett-Packard Co.*, 313 F. Supp. 2d 114, 126 (N.D.N.Y.

2004) (Mordue, J.) (citing, *inter alia*, *Tex. Digital Sys., Inc. v. Telegenix,*

*Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the ordinary meaning of a claim term itself and the

patent's specification, the prosecution history related to the patent in issue

can help inform the determination of a proper claim term construction.

*Phillips*, 415 F.3d at 1314. That history is generally comprised of "the

complete record of proceedings before the Patent and Trademark Office

[("PTO")], including any express representations made by the applicant

regarding the intended scope of the claims," and an examination of any

relevant prior art. *Vitronics*, 90 F.3d at 1582-83. Such evidence, which

typically chronicles the dialogue between the inventor and the PTO

leading up to the issuance of a patent, and thus can act as a reliable

indicator of any limitations or concessions on the part of the applicant,

oftentimes proves highly instructive on the issue of claim construction. *See*

*Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the

meaning of the claim language by demonstrating how the inventor

understood the invention and whether the inventor limited the invention in

the course of prosecution, making the claim scope narrower than it would otherwise be.").

As is discussed above, the focus of the claim construction exercise is upon the understanding of a person of ordinary skill in the art at the time of the invention as to the ordinary and customary meaning of the claim terms, considered in the context of the patent specification and prosecution history. *Butamax(TM) Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1308-09 (Fed. Cir. 2014). Such extrinsic evidence as expert declarations, particularly in the wake of *Phillips*, has been relegated to the role of a secondary sources in the claim construction hierarchy. As explained by the Federal Circuit in *Phillips*,

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for, *inter alia*, 'establish[ing] that a particular term in the patent or the prior art has a particular meaning in the pertinent field. However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.'

*Phillips*, 415 F.3d at 1318 (quoting *Pitney Bowes, Inc. v. Hewlett-Packard, Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999)); *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1361 (Fed. Cir. 2013).

B.    Claim Construction Analysis

The parties have agreed upon the constructions of the following

claim terms:

| Patent No. | Term/Phrase | Agreed Construction |
|---|---|---|
| '109 | a main body having a first end and a second end in continuous communication with one another | an uninterruptable passageway between the first and second ends of the main body whereby smoke can be evacuated through the main body |
| '576 | at least one of an outer body of an ESU pencil and an exhaust port of an integrated smoke evacuation system | the fixed member is attached to either the outer body of an ESU pencil or the exhaust port of the ESU pencil through which smoke is evacuated |
| | exhaust port | the end of an ESU pencil through which smoke may be evacuated |
| | at least a portion of an electrical cord for providing power to said ESU pencil or said ESU pencil with an integrated smoke evacuation system is contained within the fixed member and the rotating member | a portion of the electrical cord that provides power to the ESU pencil is inside the fixed and rotating members |

Dkt. No. 65 at 1-2. I recommend that the court adopt the agreed-upon

constructions as set forth above.

The parties remain in disagreement with respect to the following four

claim terms, requiring construction by the court:

| Patent No. | Term/Phrase |
|---|---|
| '109 | multifunctional telescopic electrosurgery pencil |
| | a movable telescopic body |
| | contained within at least a portion of the movable telescopic body such that it is capable of being in electrical contact with the energy source |
| '576 | a first end of a fixed member |

In this action, I.C. Medical accuses ConMed of infringing Claims 6 and 7 of the '109 Patent, and Claim 18 of the '576 Patent. Dkt. No. 71 at 5. Claim 6 of the '109 Patent is an independent claim, upon which Claim 7 is dependent. Dkt. No. 4 at 22. Claim 18 of the '576 Patent is independent. *Id.* at 32. In order to provide context for the court's claim construction analysis, the two independent claims are set forth below with the disputed claim terms highlighted:

'109 Patent, Claim 6

> 6. A **multifunctional telescopic electrosurgery pencil** for use with an energy source comprising:
> a main body having a first end and a second end in continuous communication with one another wherein the second end is capable of being coupled to smoke evacuation means for removing smoke and debris produced during a medical procedure using said electrosurgery pencil and energy source;
> **a movable telescopic body** circumferentially contained within the first end of the main body; and
> an electrode **contained within at least a portion of the movable telescopic body such that it is capable of being in electrical contact with the energy source**.

<u>'576 Patent, Claim 18</u>

> 18. A method for making a swivel-based surgical pencil comprising the steps of:
>> attaching **a first end of a fixed member** to at least one of an outer body of an ESU pencil and an exhaust port of an ESU pencil with an integrated smoke evacuation system; and
>> coupling a first end of a rotating member to an interior surface of a second end of the fixed member such that at least a portion of an electrical cord for providing power to said ESU pencil or said ESU pencil with an integrated smoke evacuation system is contained within the fixed member and the rotating member.

   1.  <u>Multifunctional Telescopic Electrosurgery Pencil</u>

As a construction for this first disputed claim term, ConMed has proposed "an electrosurgery pencil having an electrode that can be extended or retracted and used for both monopolar and bipolar applications."[4] Dkt. No. 65 at 2; Dkt. No. 72 at 10. I.C. Medical has countered by proposing to define this term as "an electrosurgery pencil capable of performing more than one electrosurgery function and having a telescopic body." Dkt. No. 65 at 2; Dkt. No. 71 at 10. While the parties do not quarrel over the term "an electrosurgery pencil," they disagree regarding the terms "multifunctional" and "telescopic."

---

[4] During the *Markman* hearing, counsel for ConMed stated that it could accept a modified construction that included an electrode whose "effective length" could be extended or retracted.

The disputed claim term appears in the preamble to Claim 6 of the '109 Patent. No particular significance is accorded to such introductory language where it is used simply to place a structurally complete invention in context or to describe its intended use. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). "A preamble limits the invention[, however,] if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int.'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808 (quotation marks and alterations omitted). "When the preamble is essential to understand claim limitations or terms in the claim body, the preamble limits claim scope." *Id.* (citing *Pitney Bowes*, 182 F.3d at 1306).

Both parties in this case agree that the term "multifunctional" in Claim 6 limits the claim's scope. I.C. Medical contends, however, that "telescopic" is not a limiting term, but rather a reference to the term "movable telescopic body" found later in Claim 6. I agree with the parties

that the term "multifunctional" limits the scope of the claim because the claim's language does not elsewhere shed light on that term's meaning or otherwise offer any clues as to whether the term refers to the different performances the device may undertake or the device's mode of operation (i.e., monopolar or bipolar), an issue over which the parties disagree. As for the term "telescopic," however, I agree with I.C. Medical that it is a descriptive term that merely references "a movable telescopic body," which is an operative limiting claim term and is explained further in the language of Claim 6. For that reason, I have opted to not construe telescopic in the context of this first disputed claim term, and instead reserve any analysis on the issue for my discussion in part III.B.2. of this report regarding "movable telescopic body." *See Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010) ("If the preamble is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim . . ., we do not construe it to be a separate limitation." (quotation marks omitted)); *see also IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434-35 (Fed. Cir. 2000) (finding the district court erred in construing a preambulatory phrase that "merely [gave] a descriptive name to the set of limitations in the body of the claim that completely set forth the invention").

With respect to the term "multifunctional," both parties have advanced plausible arguments that derive some support from the available intrinsic evidence. In defending its proposed construction, I.C. Medical notes that the '109 Patent's specification describes several functions of the disclosed electrosurgery pencil. For example, the patent describes that the invention is capable of performing cutting and coagulation, surface coagulation or ablation, argon beam coagulation, smoke evacuation, open and closed endoscopic procedures, irrigation, and suction. '109 Patent, 2:50-53 ("cutting and coagulation for open and closed endoscopic and laparoscopic procedures"), 3:15-19 ("open and laparoscopic electrosurgery"), 5:2-22 ("cutting or coagulation"), 6:20-21 ("cutting and/orcoagulation, as well as for surface coagulation or ablation"), 7:37-40 ("The main body **42** of the device **40** further comprises a series of selection buttons, one selection button for cutting **52**, one selection for coagulation **54**, and one selection button for argon beam coagulation **56**."), 8:27-31 (explaining that "[a] suction/irrigation attachment . . ., as well as a connector of smoke evacuation tubing . . . may also be connected to the proximal thread **60** of the main body **42** of the device **40**").

ConMed counters by pointing to the persistent use of the term "functioning" in the '109 Patent specification as relating to the

bipolar/monopolar aspect of the invention. *See, e.g.*, '109 Patent, Abstract ("The monopolar/bipolar electrosurgery pencil is capable of functioning as both a monopolar and a bipolar device[.]"), 1:26-34 ("The ESU pencil having a bipolar electrode is designed for use with a monopolar ESU device in a bipolar function for cutting and coagulation in medical procedures . . . . This monopolar function is prevalent in the prior art."), 2:37-46 ("The ESU pencil of the present invention has an electrode which comprises two contacts, one which is used as an active electrode and another which is used as a return electrode when the instrument is used as a bipolar functioning instrument for a monopolar/bipolar functioning instrument. Alternatively, when the instrument is only used as a monopolar functioning instruments[sic] a separate electrode is applied to a different part of the patient's body, usually on the patient's leg. This separate electrode functions as the return electrode."), 2:55-59 ("It is a further objection [sic] of the present invention to provide a monopolar/bipolar electrode which can be used on the monopolar section of an electrosurgery unit to perform a bipolar function thereby eliminating the need for a separate return electrode."), 5:58-64 ("FIGS. 2*a-c* show perspective views of different embodiments of bipolar electrodes . . . . These electrodes are capable of exhibiting both bipolar and monopolar

functioning in connection with an electrosurgery unit."), 6:41-52 ("FIGS 2*d*-
2*f* depict perspective views of bipolar electrodes . . . wherein the electrode
is also capable of monopolar functioning alone. FIGS. 2*d* and 2*e* represent
hook-shaped bipolar electrodes . . . wherein the bipolar electrodes are
also capable of functioning as monopolar electrodes. FIG. 2*f* shows a
paddle-shaped bipolar electrode for use in endoscopic and/or laparoscopic
procedures which may also function as a monopolar electrode."), 11:13-17
("For example, if a different shape or form is given to the
monopolar/bipolar electrodes but they are still capable of functioning with
a monopolar ESU suction to provide a bipolar function, this new
configuration is believed to be included within the scope of the present
invention."). ConMed argues that the pervasive use of the terms "function"
and "functioning" in conjunction with the monopolar/bipolar feature of the
invention reflects the inventor's intention to associate the term with that
attribute, rather than to denote the tasks that the electrosurgery pencil can
perform.

The adjective "multifunctional" means "[h]aving or fulfilling many
functions." *See multifunction, adj.*, Oxford English Dictionary
http://www.oed.com/view/Entry/123551?redirectedFrom=multifunctional#ei
d (last visited May 9, 2016). The noun "function" means "[t]he action of

performing; discharge or performance *of* (something)." *See function, n.*, Oxford English Dictionary (http://www.oed.com/view/Entry/75476?rskey=oFlQa5&result=1&isAdvanced=false#eid) (last visited May 9, 2016) (emphasis in original); *see also The Am. Heritage Dictionary of the English Language* 711 (Joseph P. Pickett, *et al.* eds.) 4th ed. 2000 (defining "function" as, *inter alia*, "[t]he action for which a person or thing is particularly fitted or employed"). As I.C. Medical contends, the '109 Patent describes several potential performances – or functions, as that word is ordinarily used – that the electrosurgery pencil is capable of undertaking. *See, e.g.,* '109 Patent, 5:21-24 ("cutting or coagulation"), 6:19-21 ("cutting and/or coagulation, as well as for surface coagulation or ablation"), 7:37-43 (cutting, coagulation, and argon beam coagulation), 8:27-31 (smoke evacuation). Whether the electrosurgery pencil is operated with a monopolar or bipolar electrode relates to its configuration, rather than its uses or purposes.

Another indicator supporting I.C. Medical's proposed construction is that the title of the '109 Patent is "Multifunctional Telescopic Monopolar/Bipolar Surgical Device And Method Thereof." To adopt ConMed's proposed construction would create a redundancy in the title in that the terms "multifunctional" and "monopolar/bipolar" would carry similar

meanings rendering one unnecessary. In addition, dependent Claim 8 of the '109 Patent suggests that the inventors intended to associate potential uses of the electrosurgery pencil with the various functions described in the patent. *See* '109 Patent, Claim 8 ("The multifunctional telescopic electrosurgery pencil of claim **6** further comprising means for effectuating at least one of alternate and simultaneous suction and irrigation functions.").

Another convincing indicator of the inventor's intent not to equate functions with the monopolar/bipolar configuration comes in a related patent application. The '109 Patent's specification states that the invention "is related to the same inventor's pending patent application entitled 'Telescopic Surgical Device and Method Therefor,'" and indicates that "the similarities between the . . . application [that ripened into United States Patent No. 5,693,044 ('044 Patent)] and the ['109 Patent] is [sic] that both inventions refer to a telescopic pencil which can have multifunctional applications." '109 Patent, 2:23-31. The '109 Patent's specification further explains that, while the application for the '044 Patent discloses only a monopolar electrode pencil, the pencil in the '109 Patent can be used as a monopolar instrument, a monopolar/bipolar instrument, or a bipolar instrument. *Id* at 2:31-37. These excerpts strongly suggest the inventor's

view that a strictly monopolar electrosurgery pencil can have more than one application, and that "function," therefore, refers to the types of uses for the pencil, rather than its monopolar and/or bipolar configuration.

Having carefully considered the parties' competing arguments, and for the reasons set forth above, I recommend that the term "multifunctional" be construed to relate to electrosurgery functions that can be performed by the electrosurgery pencil disclosed, rather than the pencil's bipolar/monopolar configuration. Accordingly, I recommend that the court define "multifunctional telescopic electrosurgery pencil" to mean "a telescopic electrosurgery pencil that has the ability to perform more than one electrosurgery function."

## 2. A Movable Telescopic Body

ConMed has proposed a construction of this next disputed term as "a portion of the electrosurgical pencil that can extend or retract from another portion of the pencil to lengthen or shorten the electrode." Dkt. No. 65 at 3; Dkt. No. 72 at 13. I.C. Medical has proposed that the term be construed as "a hollow tubular body that can be extended from and retracted substantially into the main body of the electrosurgery pencil and through which smoke can be evacuated." Dkt. No. 65 at 3; Dkt. No. 71 at 13.

The '109 Patent specification explains that one aspect of the
innovation disclosed "relates to a telescopic laparoscopic
monopolar/bipolar ESU pencil having an adjustable length electrode
capable of accommodating different depths and/or different sizes of adult
[sic] and children." '109 Patent, 1:35-38. To place the parties' competing
definitions in context, I have included below Figures 3*b* and 3*c* from the
'109 Patent:



FIG.3b



FIG.3c

'109 Patent, FIGS. 3*b*, 3*c.* Figure 3*b* represents an exploded perspective
view of the pencil when its parts are disassembled, while Figure 3*c* is a
cross-section depicting a telescopic body **44** as being retracted into the

main body **42** of the pencil. *Id.* at 7:44-46, 8:8-10. Generally, the patented

device is comprised of, *inter alia*, a main body **42** and a telescopic body **44**

that is contained within the main body **42** "such that [the telescopic body]

can be extended outward from, and retracted into, the main body **42**[.]" *Id.*

at 7:25-30. There is nothing in the specification to suggest, as I.C.

Medical's proposed construction does, that the telescopic movable body is

separate and distinct from the electrosurgery pencil disclosed in the

patent, rather than merely representing one component of the invention.

*See, e.g., id.* at 7:44-67 (describing Figure 3*b* as "[a]n exploded view of

the . . . device **40** of the present invention" that includes a "main body **42**,"

a "telescopic body **44**," a "bipolar electrode **48**," and a "locking element

**46**").

One of the primary objectives of the '109 Patent is "to provide a

telescopic monopolar and monopolar/bipolar electrode and pencil with

smoke evacuation means where the distance between the operating tip of

the electrode and the hand piece is adjustable to accommodate desired

lengths associated with different sized patients." '109 Patent, 2:60-65. The

device is adjustable in length by way of movement of the telescopic body,

rather than the electrode itself. In other words, it is not the electrode that

extends or retracts but the telescopic movable body, in which the

electrode is at least partially contained. *See id.*, Claim 6 ("an electrode contained within at least a portion of the movable telescopic body"). For this reason, ConMed's proposed construction that suggests the electrode itself lengthens or shortens is not proper.[5]

The additional verbiage that I.C. Medical proposes in its construction of this term, including requiring "a hollow tubular body . . . through which smoke can be evacuated," improperly imports limitations from an embodiment reflected in the '109 Patent that does not appear to be supported by the specification. While it is true that, to effectuate evacuation of smoke and debris from the surgical site, the removable telescopic body must be hollow, the '109 Patent is not so limited, nor does it require that the configuration be "tubular." Claim 6 is silent on the particular shape of the telescoping body specified and does not disclose that smoke evacuation must occur through that body. I therefore conclude that, with the modification agreed to during the claim construction hearing, ConMed's construction of this term is more persuasive, and recommend that the term "movable telescopic body" be construed as meaning "a portion of the electrosurgical pencil that can extend or retract from another

---

[5]     Again, I note that during the claim construction hearing ConMed agreed to a modification of its originally proposed construction to reference lengthening or shortening of the *effective length* of the electrode.

portion of the pencil to lengthen or shorten the effective length of the electrode."

### 3. Contained Within at Least a Portion of the Movable Telescopic Body Such That It Is Capable of Being in Electrical Contact With the Energy Source

Claim 6 of the '109 Patent requires that the electrode be "contained within at least a portion of the movable telescopic body such that it is capable of being in electrical contact with the energy source." '109 Patent, Claim 6. ConMed urges the court to adopt a construction that would define this phrase as "carried within the extending or retracting portion of the pencil in a manner that maintains electrical contact with the energy source during the extending or retracting." Dkt. No. 65 at 3; Dkt. No. 72 at 16. I.C. Medical proposes that the court construe the term as "the electrode is mounted such that it is inside a portion of the telescopic body and is connected to the energy source that powers the electrosurgery pencil." Dkt. No. 65 at 3; Dkt. No. 16.

Again, consideration of the proper construction of this term requires the court to remain mindful that one of the express objectives of the invention is to provide an electrosurgery pencil wherein the effective length between the operating tip of the electrode and the hand-held portion can be changed. *See, e.g.*, '109 Patent, 2:63-65 ("the distance between the

operating tip of the electrode and the hand held piece is adjustable"). Claim 6 epitomizes this novel structure by requiring that the electrode be "contained within" the movable telescopic body "such that it is capable of being in electrical contact with the energy source." *Id.*, Claim 6.

In my view, neither of the parties' proposed constructions with respect to the phrase "contained within" is fully supported. Read in context of both Claim 6 and the '109 Patent's specification, I see no reason that this ordinary phrase needs to be construed. ConMed's proffer to construe the phrase as "carried within" is not supported by the specification, and I.C. Medical's suggestion to construe it as "mounted" also finds little support. The word "contained" is a commonly understood term that does not take on any special meaning when read in context of the '109 Patent. *See contained, adj.*, Oxford English Dictionary, http://www.oed.com/view/Entry/40045?redirectedFrom=contained#eid (last visited May 9, 2016) (defining "contained" as "enclosed, included").

In addition, although ConMed contends otherwise by proposing to construe the phrase "the movable telescopic body" as "the extending and retracting portion of the pencil," I do not find that construction of this phrase necessary in light of the fact that the phrase "movable telescopic

body" is construed elsewhere and my recommended construction does not accord with that proffered by ConMed with respect to this disputed term.

I agree with ConMed, however, that this disputed term should be construed to the extent that it reflects that one of the objectives of the invention disclosed in the '109 Patent is that, as is discussed at length above, the effective length of the electrode increases and decreases as the telescoping body extends and retracts from the main body. Describing Figure 3*b* of the patent, the specification explains that this objective is accomplished by the electrode **48** being connected to the telescopic body **44** such that it is in contact with elongated conductors **76, 78**, which terminate in contact prongs **80, 82** that are located on the external surface of the telescopic body near its proximal end **72**. '109 Patent, 7:55-58, 64-66. Accordingly, I recommend that the disputed term "contained within a least a portion of the movable telescopic body such that it is capable of being in electrical contact with the energy source" be construed as "contained within at least a portion of the movable telescopic body in a manner that it maintains consistent electrical contact with the energy source."

### 4. A First End of a Fixed Member

The parties are also in disagreement over one claim term in the '576 Patent, which specifies "a first end of a fixed member." ConMed proposes that the claim term be defined to mean "one end of a member separate from the pencil that is fixed relative to the pencil." Dkt. No. 65 at 3-4; Dkt. No. 72 at 21. I.C. Medical, by contrast, urges the court to define the term to mean "the end of the fixed member that is located further than the second end of the fixed member from the exhaust port of the ESU pencil." Dkt. No. 65 at 3-4; Dkt. No. 71 at 20. The parties disagree whether the fixed member must be separate from the outer body of an electrosurgery pencil, or instead whether, together, they can comprise a single member.

As the Federal Circuit has noted, "[w]here a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quotation marks and alterations omitted). In this case, the applicability of this principle is buttressed by method Claim 18, which specifies that one of the steps includes "*attaching* a first end of a fixed member to at least one of an outer body of an ESU pencil and an exhaust port of an ESU pencil with an integrated smoke evacuation system[.]" '576

Patent, 8:21-24 (emphasis added). If the first end of the fixed member and the outer body of the electrosurgery pencil are not separate members, then the step of attaching the two is rendered redundant, a result that cannot be correct.

The case cited by I.C. Medical in support of its position, *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2012), does not undermine this result. In that case, the Federal Circuit found that the reasoning of *Becton* should not apply because the specification of the patent in suit taught that the two structural elements in issue – a cutting box and a dust collection structure – could be one in the same, and that the cutting box could also function as a dust collection structure. *Powell*, 663 F.3d at 1231-32. There is no similar indication in the specification of the '576 Patent teaching that the fixed member and outer body of the electrosurgery pencil can be part of the same, integrated structure.

Having carefully considered the competing arguments of the parties, I recommend that the claim term "a first end of a fixed member" found within a method claim of the '576 Patent be construed to mean "one end of a member separate from the pencil that is fixed relative to the pencil."

## IV. SUMMARY AND RECOMMENDATION

Based upon the parties' oral and written presentations, and having carefully considered the available intrinsic evidence and, to the limited extent necessary, extrinsic evidence, it is hereby respectfully

RECOMMENDED that the court adopt the following constructions of the claim terms in issue in this matter:

(1) Agreed Upon Terms

| Patent No. | Term/Phrase | Agreed Construction |
|---|---|---|
| '109 | a main body having a first end and a second end in continuous communication with one another | an uninterruptable passageway between the first and second ends of the main body whereby smoke can be evacuated through the main body |
| '576 | at least one of an outer body of an ESU pencil and an exhaust port of an integrated smoke evacuation system | the fixed member is attached to either the outer body of an ESU pencil or the exhaust port of the ESU pencil through which smoke is evacuated |
| | exhaust port | the end of an ESU pencil through which smoke may be evacuated |
| | at least a portion of an electrical cord for providing power to said ESU pencil or said ESU pencil with an integrated smoke evacuation system is contained within the fixed member and the rotating member | a portion of the electrical cord that provides power to the ESU pencil is inside the fixed and rotating members |

(2)    <u>Claims in Dispute</u>

| Patent | Term | Construction |
|---|---|---|
| '109 | multifunctional telescopic electrosurgery pencil | a telescopic electrosurgery pencil that has the ability to perform more than one electrosurgery functions |
| | a movable telescopic body | a portion of the electrosurgical pencil that can extend or retract from another portion of the pencil to lengthen or shorten the effective length of the electrode |
| | contained within at least a portion of the movable telescopic body such that it is capable of being in electrical contact with the energy source | contained within at least a portion of the movable telescopic body in a manner that it maintains consistent electrical contact with the energy source |
| '576 | a first end of a fixed member | one end of a member separate from the pencil that is fixed relative to the pencil |

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     May 12, 2016
           Syracuse, New York

_____

David E. Peebles
U.S. Magistrate Judge